In re:                                                    Case No. 25-26829
City on a Hill, Inc.,                                     Chapter 11 (Subchapter V)
                              Debtor.

**DECLARATION OF MICHAEL B. WILLIAMS**

I, Michael B. Williams, hereby declare as follows:

1.      I am the interim executive director for City on a Hill, Inc. (the "Debtor") and a member of its board of directors.  I am generally familiar with the Debtor's day-to-day operations, financial and business affairs, and books and records.

2.      I make this declaration in support of the Debtor's petition for relief under Chapter 11 of the Bankruptcy Code and its first-day motions filed on December 5, 2025 (the "Petition Date").  Unless otherwise stated, the facts set forth herein are based on my personal knowledge, upon records obtained by the Debtor in the ordinary course of business that I have reviewed, or upon information provided to me by the Debtor's attorneys or employees.

A.      **The Debtor's Structure**

3.      In 1863, William Passavant, a Lutheran minister, established a hospital in a converted farmhouse to care for the sick and poor.  In the 1880s, the hospital built a new seventy-bed brick hospital on 22nd Street and West Kilbourn Avenue, with patient care provided by the sisters of the Deaconess order.

4.      The hospital eventually became known as the "Milwaukee Hospital" and, over the next several decades, expanded its campus and capacity to provide care.  In 1966, the Milwaukee Hospital changed its name to "Milwaukee Lutheran Hospital".

1

5.      The Milwaukee Lutheran Hospital continued to operate independently until 1980, when it merged with Deaconess Hospital (then located on 19th Street and West Wisconsin Avenue) to form Good Samaritan Hospital.  Over the next five years, the Deaconess Hospital transitioned services to the Milwaukee Lutheran Hospital.  Deaconess Hospital was eventually sold to Marquette University and razed.

6.      In 1987, Mount Sinai Hospital, located on 12th Street and West Kilbourn Avenue, and Good Samaritan Hospital merged to create "Sinai Samaritan Medical Center" with an east campus (Mount Sinai Hospital) and west campus (Good Samaritan Hospital).  However, in the 1990s, the west campus closed and stopped operating as a hospital.

7.      The Good Samaritan Hospital campus remained vacant and unused until 2000.  In August of that year, Convoy of Hope, a national relief organization, brought semi-truck loads of food for a community outreach event co-sponsored by dozens of churches and the Urban Ministry Center of the Assemblies of God, the forerunner of the Debtor.  In one day, the organizers provided over 8,000 neighborhood residents with a meal, groceries, a job fair, health services, children's games, haircuts, music, and the gospel.

8.      After the event, the owners of the Good Samaritan Hospital campus began a dialogue with the local coordinating agency about the future use of the campus.  Eventually, a network of churches known as the Wisconsin and Northern Michigan District Council of the Assemblies of God (the "District Council") organized the Debtor, then operating as "City of Hope, Inc.", with the intent of returning the Good Samaritan Hospital campus to its original purpose: faith-based care for the sick and the poor.  The members of the District Council's Board of Presbyters still serve as the members of the Debtor.

9. Four months later, Sinai Samaritan Medical Center, Inc. donated to the Debtor the real property that formed the Good Samaritan Hospital's campus. At that time, the campus consisted of six buildings with approximately 321,000 square feet of property located on one parcel of real estate, and three other parcels which were used as parking lots.

10. In 2004, the Debtor established the "Kilbourn Square Condominium" at the campus, creating three separate condo units. The Debtor currently owns Unit 1, which consists of approximately 143,000 square feet. Unit 2 consists of the "Historic Lofts on Kilbourn" and Unit 3 consists of the "William A. Passavant Senior Apartments", both of which are owned by independent third-parties. The Milwaukee Academy of Science owns and operates the former patient tower, which, while attached to the campus, is not part of the declared condominium.

11. After the Debtor acquired the campus in 2001, the Debtor began its mission by launching a monthly health outreach program to serve people's medical needs. Around that same time, Diane De La Santos began her relationship with the Debtor as a board member. Ms. De La Santos had worked in a marketing position with Good Samaritan Hospital and later joined Aurora Health Care.

12. In 2004, Ms. De La Santos left her position as vice president of public affairs and marketing at Aurora to become the Debtor's executive director. Ms. De La Santos continued to lead the organization until she retired at the end of 2022. Over her nearly twenty years leading the Debtor, Ms. De La Santos greatly expanded the Debtor's ministry and outreach:

- In 2004, the Debtor sold Unit 2 of the Kilbourn Square Condominium so that it could be developed into ninety-nine units of affordable housing on the campus.

- In 2010, the Debtor launched an after-school center for children and youth in the neighborhood.

- In 2011, the Debtor sold Unit 3 of the Kilbourn Square Condominium so that it could be developed into fifty-one units of affordable housing for senior citizens.

- In 2015, with the help of Bader Philanthropies, the Debtor launched a summer employment program that teaches youth employment soft skills.

- In 2016, Aurora Better Together awarded the Debtor a grant to renovate a space on the campus for a free health care clinic.

- In 2024, the Debtor opened a dental clinic to complement its health and behavioral care clinics.

13. Today, the Debtor provides three critical ministries for the uninsured and underserved residents of Milwaukee's central city: (1) the Debtor provides healthcare, dental care, and social services; (2) the Debtor offers a variety of youth and family programs that provide emotional, social, and academic support; and (3) the Debtor provides training opportunities and experiences to mobilize and equip individuals with tools to improve the well-being of their community.

14. In 2024, the Debtor had over 3,600 patient visits at its health care clinic, 1,275 health screenings, and 381 counseling sessions. We also had 1,171 youth visits for life skills classes, served 2,970 meals to children, and facilitated over 8,484 volunteer hours.

15. Substantially all the Debtor's income comes from government grants and donations from private foundations. In addition, we also rely on the generosity of private corporations, churches, and individuals.

**B.      The Debtor's Workforce**

16. To fulfill its mission, the Debtor employs a talented and dedicated workforce of approximately fourteen employees, of which eleven are full-time and three are part-time. Those employees offer the Debtor various skills and provide critical services, including (among other things) managing the Debtor's health and social service programs, writing grants, coordinating volunteers, fundraising, and marketing. Simply put, the employees are essential to the Debtor's ability to sustain its operations and fulfill its charitable mission.

4

17. As much as the Debtor relies on the talent and skills of its employees, the employees are similarly reliant on the Debtor to support their livelihoods. The employees cannot work without timely compensation.

18. The Debtor compensates its employees in two different ways: seven employees are paid based on an annual salary and seven employees are paid based on hours worked. The Debtor also provides a variety of benefit programs:

- **Health Insurance.** The Debtor offers regular, full-time employees a health insurance benefit provided by UnitedHealthcare. Seven employees participate in this benefit program. The Debtor pays approximately $10,896.03 per month for its health insurance benefit. The Debtor pays 60% of monthly premiums for full-time employees, and the remaining 40% is collected from participating employees through payroll deductions.[1] As of the Petition Date, the Debtor has paid its health insurance premiums for the month of November. The next payment is due in December.

- **Dental Insurance.** The Debtor offers regular, full-time employees a dental insurance benefit provided by Delta Dental. Seven employees participate in this benefit program. The Debtor pays approximately $630.45 per month for its dental insurance benefit. The Debtor pays 60% of monthly premiums for full-time employees, and the remaining 40% is collected from participating employees through payroll deductions. As of the Petition Date, the Debtor has paid its dental insurance premiums for the month of November. The next payment is due in December.

- **Vision Insurance.** The Debtor offers regular, full-time employees a vision insurance benefit provided by Delta Dental. Although the Debtor advances the monthly premium expense of $45.77, employees pay the full premium through payroll deductions. Four employees participate in this benefit program. As of the Petition Date, the Debtor has paid its vision insurance premiums for the month of November. The next payment is due in December.

- **Life and Long-Term Disability Insurance.** The Debtor offers regular, full-time employees a life and long-term disability insurance benefit provided by Reliant Insurance Group. The Debtor pays approximately $260.65 per month for its life and long-term disability insurance benefit. The Debtor pays the entire monthly premiums for full-time employees. The Debtor is behind on its payments to

---

[1] The Debtor previously paid 75% of the insurance premiums while employees paid 25% of the insurance premiums. In June 2025, to address budgetary constraints, the Debtor decided to decrease its contribution to 60% and increase the employee contribution to 40%. If the Debtor's budget allows, the Debtor hopes to return to paying 75% of the insurance premiums sometime in 2026.

5

Reliant Insurance Group; as of the Petition Date, the Debtor owes approximately $2,385.49.

- **Health Savings Account.** The Debtor offers employees an optional health savings account into which employees can direct pre-tax earnings (at their own expense).

- **Retirement Plan.** The Debtor offers full-time employees access to a 403(b) retirement plan. The Debtor matches up to 3% of gross earnings for employees who are in their first three years of employment and automatically contributes 3% of gross earnings for employees who have worked at least three years, 6% of gross earnings for employees who have worked at least five years, and 7% of gross earnings for employees who have worked more than ten years.

- **Paid Time Off.** The Debtor offers full-time employees paid time off based on their length of service. Employees who have worked more than six months are eligible for up to ten days; employees who have worked more than one year are eligible for up to fifteen days; employees who have worked more than three years are eligible for up to twenty days; employees who have worked more than ten years are eligible for up to twenty-five days; and employees who have worked more than twenty-five years are eligible for up to thirty days.

- **Sick Time Off.** The Debtor offers full-time employees eighty hours of sick time off at the beginning of each calendar year.

- **Paid Parental Leave.** The Debtor offers all regular, full-time employees who have been employed for at least six months for paid parental leave.

- **Paid Holidays.** The Debtor pays full-time employees and part-time employees (more than 0.5 FTE) for time off on twelve holidays. The Debtor also provides employees with three floating holidays that can be used to celebrate holidays that are specifically meaningful to them and their families.

19. During each applicable pay period, the Debtor also routinely withholds certain amounts that the Debtor is required to transmit to third parties, such as wage garnishments, child support payments, federal and state income tax withholdings, and payroll taxes.

20. As of the Petition Date, the Debtor estimates that its employees are owed approximately $13,500.00 on account of employee compensation earned pre-petition. This amount represents an approximate estimate of $11,500.00 of gross earnings plus $2,000.00 of employer-paid taxes. Of the estimated gross earnings, the Debtor would remit approximately

6

$2,000.00 towards employee-paid taxes and $1,400.00 towards other deductions.  These

obligations represent the pay period running from November 30, 2025, to the Petition Date and

are estimated at 4/10 of the average weekly time compensated in three previous payroll cycles.

21.     The Debtor's current pay period continues through Saturday, December 13, 2025,

and would be paid in the normal course of business on Thursday, December 18, 2025.

**C.      Conditions Leading to Filing**

22.     In 2024 and early 2025, the Debtor faced budget constraints resulting from

declining grant revenue.  To address these constraints, the Debtor entered into various

agreements, including merchant cash advances, to generate working capital.  However, the cost

of this working capital was expensive and unsustainable.  For instance, in February 2025, the

Debtor entered into a "Commercial Loan and Security Agreement" with "The Fundworks, LLC"

which required the Debtor to repay $510,600.00 on for a loan of $370,000.00, with a maturity

date of January 26, 2026 (with required minimum payments every week of $10,212.00).  The

Debtor was unable to make payments under that agreement.

23.     In addition, some of the agreements to obtain working capital were not authorized

by or disclosed to the Debtor's board of directors, as required by the Debtor's Bylaws.

Accordingly, the Debtor's board was unaware that the Debtor was entering into expensive

financing arrangements.  In June 2025, shortly after the board learned about these obligations,

the board decided that the Debtor would benefit from new leadership.  The Debtor and the

Debtor's previous director parted ways, and the board subsequently hired me as the interim

executive director.  I have over twenty-five years of experience in budget management, program

development, and community engagement.  Prior to joining the Debtor, I served as president and

chief executive officer of the Guest House of Milwaukee, a short-term homeless shelter, and

director of residential services at Lad Lake, Inc., an organization specializing in trauma-informed services for youth.

24. Since I was hired as the interim executive director, I have worked with the Debtor's board and staff to review and assess the Debtor's financial operations. Although we have made progress stabilizing the Debtor's operations, the Debtor's board decided to authorize the filing of a petition for relief under Chapter 11 of the Bankruptcy Code so that the Debtor could restructure and potentially compromise its previous debts on more manageable terms and emerge from bankruptcy as a healthier, more viable organization.

25. Over the past several weeks, I have worked with the Debtor's counsel and our leadership team to review the Debtor's business operations and to develop a strategy to address those challenges. In addition, our team has had regular communications with many of our community partners and donors. I believe there is a strong possibility that the Debtor will successfully emerge from this Chapter 11 proceeding.

**D.** **Cash Collateral and Post-Petition Financing**

26. The Debtor has approximately $15,000.00 of cash on hand as of the Petition Date.

27. The Debtor has accounts receivable of approximately $48,000.00. The Debtor records all anticipated receipts as "accounts receivable" in its book and records, regardless of whether the receipts are actual accounts receivable, anticipated grants, or other donations.

28. Based on the Debtor's debt facilities, I believe that the cash on hand generated directly from actual accounts receivable and future accounts receivable _may_ be encumbered by liens either arising from the loan and/or collateral documents (which may be unperfected).

29. In connection with this Chapter 11 case, I understand that the Debtor's counsel performed a search through the Wisconsin Department of Financial Institutions to determine

8

which creditors have filed a UCC financing statement. Based on the search, there are five UCC financing statements filed with the Wisconsin Department of Financial Institutions.

30. Based on those UCC Financing Statements and other loan documents in the Debtor's possession, I believe that the following entities may have an interest in cash collateral: (1) LEAF Capital Funding, LLC; (2) The Fundworks, LLC; (3) Saturn Encore Funding; (4) CFG Merchant Solutions, LLC; and (5) the Milwaukee Economic Development Corporation ("MEDC"). The nature of those parties' potential interest in the cash collateral is set forth in the Debtor's Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Granting Adequate Protection.

31. The Debtor uses cash on hand, and cash flow from operations, to meet its working capital needs, including payment to and for the benefit of employees, trade vendors, and insurers. Without access to the cash and proceeds from accounts receivable, I believe that the Debtor's ability to continue operating on an uninterrupted basis and utilize Chapter 11 to pursue an orderly restructuring would be jeopardized.

32. In connection with the Debtor's first day motions, I assisted counsel with preparing a standard thirteen-week cash flow budget that is typically filed in Chapter 11 cases. The budget contains line items for revenue and operating expenses. I believe that the budget contains all reasonable, necessary, and foreseeable expenses to be incurred in connection with the Debtor's operations for that period.

33. I also believe that the budget is conservative with respect to revenue. While the Debtor historically receives various grants and donations in December, we have excluded certain grants from revenue (totaling $130,000.00) based on the possibility that this bankruptcy case may impact the timing or amount of those grants.

34. Based on our thirteen-week cash flow budget and the uncertainty related to certain grants, I believe that the Debtor will need access to a post-petition credit facility in early January 2026. The Debtor is working to secure a post-petition line of credit (the "DIP Facility") with MEDC, a Community Development Financial Institution. I am hopeful that MEDC will approve the DIP Facility in the next three weeks.

35. I understand that the Court cannot enter a final order authorizing the use of cash collateral for at least fourteen days. However, while that fourteen-day period is pending, I believe that the Debtor requires interim relief to avoid immediate and irreparable harm.

E. **Utility Services**

36. The Debtor currently receives services from various utility providers, including the City of Milwaukee for water, WE Energies for electric (both directly and through Milwaukee Academy of Science)[2], National Educational Energy Cooperative for gas, Spectrum for internet, and 3CX for phone services.

37. The Debtor cannot operate without those utilities. I believe that any disruption to the Debtor's access to those utilities would cause irreparable damage to the Debtor's ongoing business operations and the bankruptcy estate.

38. However, the Debtor is not current with payments to certain utility providers. Accordingly, to ensure continued services after the commencement of this case, the Debtor is prepared to provide adequate assurance of future payment by depositing into a separate

---

[2] Milwaukee Academy of Science owns the former patient tower that is connected to the Kilbourn Square Condominium. While the patient tower is not part of the condominium, the electric utility for the patient tower and the condominium are connected. Thus, Milwaukee Academy of Science is titled on the WE Energies account and receives the electric bill for the condominium. The Debtor is then supposed to reimburse Milwaukee Academy of Science for the Debtor's portion of the electric bill.

10

"Adequate Assurance Deposit Account" an amount equal to one month of all utility charges incurred (based on a twelve-month average).

39.     To that point, in connection with the preparation for this case, the Debtor's staff reviewed the past twelve months of invoices for those utility providers and calculated an average (rounded up to the nearest $10.00 increment) as follows:

| Utility | Type | Average Monthly Charge |
|---|---|---|
| City of Milwaukee | Water | $1,990.00 |
| WE Energies (direct) | Electric (exterior lights) | $180.00 |
| Milwaukee Academy of Science | Electric | $5,550.00 |
| WE Energies | Gas | $920.00 |
| National Educational Energy Cooperative | Gas | $4,430.00 |
| Spectrum | Internet | $220.00 |
| 3CX | Phone | $90.00 |
| SaberCor | Trash and Recycle | $450.00 |
| | **Total** | **$13,830.00** |

## F.     Insurance

40.     In the ordinary course of its business, the Debtor maintains various insurance policies through Church Mutual Insurance Company, S.I. for (1) Commercial Crime; (2) Commercial General Liability; (3) Employment Practices Liability; (4) Medical Professional Liability (for nurses); (5) Management Protection Liability; (6) Commercial Property; and (7) Terrorism – Certified Acts (General Liability and Property).  Those policies run from January 1, 2025, to January 1, 2026.  The Debtor is current on payments for those insurance policies.  The Debtor also maintains a Worker's Compensation Policy and a Medical Professional Liability Policy (for other medical professionals).

41.     In addition, the Debtor shares a condominium insurance policy with the other owners of Unit 2 and Unit 3 in the Kilbourn Square Condominium.  The owner of Unit 2,

11

Harmony Housing Advisors, Inc., pays the policy premium and then expects the other owners to reimburse it for their share of the cost.  The Debtor's share of the premium is $97,286.00.

42. The Debtor was supposed to make three installment payments earlier this year: $25,000.00 in June 2025; $25,000.00 in August 2025; and $25,000.00 in November 2025.  In addition, the Debtor is supposed to make one additional payment of $22,286.00 in February 2026.

43. The Debtor was unable to make the first three installment payments to Harmony Housing Advisors, Inc.  As a result, the Debtors owe Harmony Housing Advisors, Inc. $75,000.00.

44. I understand that Chapter 11 debtors are required to maintain insurance for the duration of the case.  Accordingly, the Debtor will seek approval to pay the amounts due and owing to Harmony Housing Advisors, Inc. to ensure that the Kilbourn Square Condominium campus is covered by appropriate insurance.

*****

45. Nothing contained in this declaration is intended to in any way comment on or concede the validity, enforceability or priority of any particular claim, but rather is a summary of the Debtor's books and records as they are kept in the ordinary course of business.

[signature page follows]

12

**Declaration**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Executed: December 5, 2025.

MICHAEL B. WILLIAMS

13